### ROTHMAN v. INTERBOROUGH RAPID TRANSIT CO.

(Supreme Court, Special Term, New York County. February 2, 1910.)

LIMITATION OF ACTIONS (§ 55*) — INJURIES TO PROPERTY — ACTIONS—"OPERATION."

A cause of action against a railroad operating a road in front of premises accrues when every part of the road is adjusted according to its final construction and it begins to carry passengers, for until that time it is not in "operation," defined as active exercise of some specific function of office, or power exercised in producing an effect, though prior to that time construction and experimental trains had been operated.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 299–306; Dec. Dig. § 55.*

For other definitions, see Words and Phrases, vol. 6, pp. 4992–4993.]

Action by Thomas Rothman against the Interborough Rapid Transit Company. Motion to dismiss complaint denied.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Skinner & Bermant, for plaintiff.
J. L. Quackenbush, for defendant.

DAYTON, J.   Plaintiff brought this action October 17, 1908, to recover $5,000 damages for trespass, and for an injunction restraining the operation of defendant's railroad in front of the premises at the northwest corner of Second avenue and Twenty-Fifth street, being 25 feet 8¼ inches on Second avenue, and for the purposes of this action 65 feet on Twenty-Fifth street, to which he took title February 13, 1906.   Defendant urges that in May, 1879, the construction of its road was begun in front of said premises, and was essentially completed in January, 1880, and that it remained in hostile possession until February 28, 1900, when plaintiff's predecessor brought an action in this court (now pending and undetermined) for injunctive relief more than 30 days after the prescriptive period had expired.

The evidence shows that on and subsequently to January 15, 1880, construction and experimental trains were run in front of this property, but that not until March 1, 1880, was the road completed, and its trains operated for passenger traffic.   "Operation" is defined in the Century Dictionary as "active exercise of some specific function of office; power exercised in producing an effect."   The Standard Dictionary gives, as synonyms of "operation," "performance, procedure, result," and defines that word as "a course or series of acts to effect a certain purpose."   The object of the statute was to authorize a railway for the use of the public.   That object was not attained until every part of the railway was adjusted according to its plan of construction, and not until it began to carry passengers was it in operation. All things occurring before that moment were preparatory.   The running of the invited guests' train on January 15, 1880, was an exhibition or probable test as an assurance to the community that the railway was safe—an evidence that it would soon be in "operation" in the conduct of its business.   Six weeks thereafter such operation was commenced, for on March 1, 1880, tickets were sold for trains moving on schedule time.   Then and not until then did it begin to exercise its franchise and to incur its operating expenses and become amenable to the law as an operating railway.   I understand the rule to be that prescription here first began March 1, 1880.   Muller v. Elevated R. R., 53 Misc. Rep. 133, 102 N. Y. Supp. 454, affirmed 124 App. Div. 296, 108 N. Y. Supp. 852; 195 N. Y. 539, 88 N. E. 1126.

The present building on these premises was erected in 1876, and up to 1886 produced a rental of about $3,000 annually.   From 1886 to 1900 the rentals were about $3,300 annually.   In 1900 the building was renovated at a cost of several thousand dollars, and up to 1906 the rentals were about $4,000 annually.   During 1906, 1907, and 1908 the rentals were about $3,250 annually.   The fee values claimed by plaintiff are as follows: 1876, $37,000; 1879, $35,000; 1885, $35,000; 1896, $36,250; 1900, $40,000; 1909, $39,250.   Testimony was also given to show the course of fee and rental values in Second avenue and parallel avenues and side streets, from which it appears that within a radius of First avenue to the east, Fourth avenue to the west,

Twenty-Third street to the south, and Thirty-Third street to the north, the increase in values from 1873 to 1909 varied from 10 per cent. to 400 per cent. This was controverted by defendant's expert. It would seem that the rentals derived have been ample upon the investment. They remained practically stationary from 1886 to 1900. From 1900, when the premises were renovated, until 1906, the increase was about $700 annually. From 1906 to 1909 they returned to about the rates prevailing between 1886 and 1900. The testimony tended to show that since 1873 to the day of the trial rentals on side streets and parallel avenues increased from 25 per cent. to 50 per cent. Notwithstanding the excellent returns upon this investment it "is permissible to infer that the course of values in Second avenue had been much less favorable at this point than in the neighboring side streets and in the neighboring and parallel avenues, and that it was attributable to the presence and effects of the elevated railroad." Storck v. Elevated R. R., 131 N. Y. 514, 30 N. E. 497.

Plaintiff makes no claim for damages to that portion of his premises which does not front on Second avenue, and asks rental damages from February 13, 1906, to date of trial, November 23, 1909. Under the authorities the motion to dismiss the complaint is denied, with exception to defendant, and plaintiff is awarded $3,300 fee damage and $1,125 rental damage, with 5 per cent. additional allowance.